## TRAITEL MARBLE CO. v. MANHATTAN TERRAZZO BRASS STRIP CO., Inc.

### No. 451.

Circuit Court of Appeals, Second Circuit.
July 5, 1932.

George F. Scull and Frank J. Kent, both of New York City, for appellant.

Hans v. Briesen and Fred A. Klein, both of New York City, for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

This suit is for infringement of claims 4, 5, 6, and 7 of the Calkins patent, No. 1,451,491, granted April 10, 1923, for a pattern and guide strip used for terrazzo flooring. We considered the patent and held it valid and infringed in Traitel Marble Co. v. Hungerford, 22 F.(2d) 259. See, also, Traitel Marble Co. v. Hungerford (C. C. A.) 18 F.(2d) 66. We may now consider only the claim of noninfringement.

Because of the limitations which must be placed on the claims in suit, in view of the prior art, we must hold that the appellant does not infringe.

The Mainzer British patent, No. 3,947 (1901), provides broadly for terrazzo strips with locking means which will firmly fix the strip in the underbody of cement which, together with the projections and openings, prevent the strip working loose. When the cement hardens, it will resist any upward movement of the strip. In the Dart patent, No. 421,560, an artificial stone blocking for paving was provided with a flexible strip of metal for a binder extending across the contacting surfaces of the two upper layers. The strip was provided with indentures of any desired shape which may "extend entirely through the plate." The indenture is formed with a partially rounded punch, and the inventor preferred "that the opening be formed entirely through the plate in order that the cement may pass through the opening in such plate and by means of the burr or barb formed on one side of the plate prevent the latter from any displacement when placed in position in the block." In the Del Turco patent, No. 1,368,374, a terrazzo strip in which a thin portion, preferably of wood, attached to the metal strip, is forced down into the underbed, the lower part of the strip being made pointed or tapered so as to facilitate the insertion. The upper edge of the wooden strip is also prepared to prevent the underbed, when drying, from forcing the strip upward.

When the case was here before, we compared Mainzer's strip with the patent in suit, noting that Mainzer provided lugs or notches, but we said that never at any juncture of the underbed and the terrazzo was there a suggestion of ears which stuck out from the strip to serve as stops for the descent of the strip as it was pushed into the concrete.

The claims in suit, therefore, must necessarily be limited to their recitals. Claim 4 specifically recites that the strip is to have openings between its upper and lower edges and means which are to project horizontally at the upper edge of each opening and with further limitation that these means are to constitute not only stops limiting the penetration of one edge of the strip, but also are to tamp the materials and urge the same within the openings. "Projecting horizontally at the upper edge of the opening means," the inclusion of the function states, also describes the construction. The tamping can occur only if the ears are in position to press on the relatively soft underbody as the strip is being forced into place with the opening below the ear at the time. The downward pressure of the underbody, with the space that is to be filled located below the ear, is the only way in which the tamped material can be made to flow into the opening. This is a method by which the ear acts as a stop. In claim 5, the ear or means is located at one edge of each opening. This permits the ear to stick out either from the bottom or either of the side margins of the opening, and the claim recites "means at the opposite edge of each opening acting to firmly anchor the strip in the plastic material against an upward vertical movement." Claim 6 recites that the ears project "from one side of the strip at the upper edges of said openings" with their functional limitations of claim 4. In claim 7, the ears are located directly on top of the openings, and the so-called anchor bridge (the ear) becomes the bottom of the strip and the opening is to prevent upward movement of the strip in the underbody, a function which can only be performed by something at the bottom of the opening forming a lock with the underbody. Therefore, with the limitations of the claims in suit, it is apparent that the ear must extend horizontally from or at right angles to the strip along the upper edge of the opening.

The appellant's strip has an arc-shaped anchor spaced along the strip every 5 or 6 inches. It is slightly coned. The anchor is made by first slitting the metal of the strip in

two horizontal lines spaced apart and then bowing out the intervening metal into the arc shape. The larger end of the cone is at the bottom. The appellant's strip may be submerged so that sometimes the top of the arc is above the joinder between the terrazzo and the underbody and sometimes below it. It is sometimes located so that the top of the rack is just at the juncture between the terrazzo and the underbody with the arc entirely submerged in the underbody. Its racks are anchors which hold the strip snuggly against one edge of the terrazzo block if the blocks pull apart in shrinking. They are provided to resist lateral movement.

Because the appellant's racks do not extend from nor are they connected to the strip along the upper edge of the opening, which is formed when they are bent out of the strip, they do not infringe. Their connection to the strip is only at the two vertical edges of the opening. They are not horizontal in any way as provided in the Calkins patent. Their top and bottom edges are horizontal, but their faces are vertical or substantially so. When the Calkins patent describes the ears as horizontal, it means the faces and not the edges of the ears. In order to find infringement, it would be necessary to ignore entirely, in claim 5, the limitation of means projecting horizontally from the edge of the opening which is opposite the edge of the opening which acts to anchor the strip against upward movement, and in claim 7, to ignore the ears as extending at right angles to the plane of the strip and the limitation of these ears located on one side of the opening remote from the bridge portion of the strip which anchors the strip against upward movement. To disregard these limitations would give the claims a scope which apparently were rejected and canceled when the patent was passing through the Patent Office. We may not substitute new elements in the claims for those chosen by the inventor. Fulton Co. v. Powers, 263 F. 578 (C. C. A. 2); Geoghegan v. Ernst, 256 F. 670 (C. C. A. 2); Motion Pictures Patents Co. v. Independent M. P. Co., 200 F. 411 (C. C. A. 2).

Nor do we think the appellant's arcs function as claimed. The arc is slightly coned, but it is so slight that it is entirely negligible so far as resistance to penetration is concerned. Its arcs are not ears in any practical sense in so far as the limitation of penetration is concerned. In any case, it is not a flat horizontal ear as called for in the Calkins claims to resist penetration.

The decree is reversed.